NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT

JOHN DOE, )
            )
        Petitioner, )
            )
v. )        Case No. 2D16-1328
            )
STATE OF FLORIDA, )
            )
        Respondent. )
_____ )
            )
C.Y., )
            )
        Petitioner, )
            )
v. )        Case No. 2D16-1399
            )
STATE OF FLORIDA, )
            )
        Respondent. )
_____ )
            )
H.H., )
            )
        Petitioner, )
            )
v. )        Case No. 2D16-1402
            )
STATE OF FLORIDA, )
            )
        Respondent. )
_____ )

E.P.,

        Petitioner,

v.                               Case No. 2D16-1403

STATE OF FLORIDA,

        Respondent.

R.C.,

        Petitioner,

v.                               Case No. 2D16-1408

STATE OF FLORIDA,

        Respondent.

J.G.,

        Petitioner,

v.                               Case No. 2D16-1410

STATE OF FLORIDA,

        Respondent.

R.D.,

        Petitioner,

v.                               Case No. 2D16-1434

STATE OF FLORIDA,

        Respondent.

M.R.,

       Petitioner,

v.                              Case No. 2D16-1560

STATE OF FLORIDA,

       Respondent.

M.R.,

       Petitioner,

v.                              Case No. 2D16-1561

STATE OF FLORIDA,

       Respondent.

K.M.,

       Petitioner,

v.                              Case No. 2D16-1562

STATE OF FLORIDA,

       Respondent.

J.M.,

       Petitioner,

v.                              Case No. 2D16-1563

STATE OF FLORIDA,

       Respondent.

C.W.,

   Petitioner,

v.             Case No. 2D16-1564

STATE OF FLORIDA,

   Respondent.

_____

G.P.,

   Petitioner,

v.             Case No. 2D16-1565

STATE OF FLORIDA,

   Respondent.

_____

A.P.,

   Petitioner,

v.             Case No. 2D16-1566

STATE OF FLORIDA,

   Respondent.

_____

A.B.,

   Petitioner,

v.             Case No. 2D16-1567

STATE OF FLORIDA,

   Respondent.         CONSOLIDATED

_____

Opinion filed September 28, 2016.

Petitions for Writ of Mandamus to the
Circuit Court for Lee County; H. Andrew
Swett, Acting Circuit Judge.

Kathleen A. Smith, Public Defender, and
Gary H. Bass and Heather Sutton-Lewis,
Assistant Public Defenders, Fort Myers,
for Petitioners.

Pamela Jo Bondi, Attorney General,
Tallahassee, and Caroline Johnson
Levine, Assistant Attorney General,
Tampa, for Respondent.

BLACK, Judge.

In these fifteen petitions for extraordinary writs, one "John Doe" and fourteen patients ask this court to direct the judicial officers assigned to preside over Baker Act hearings in Lee County to appear for those hearings at the receiving facilities where the patients are held rather than via videoconference from the courthouse.[1]  We deny the petitions but certify a question of great public importance to the Florida Supreme Court.

The Baker Act, §§ 394.451-.47891, Fla. Stat. (2015), also known as the Florida Mental Health Act, establishes a process by which individuals believed to have "mental, emotional, and behavioral disorders" may be civilly committed for mental health

---

[1]We have consolidated these fifteen cases solely for the purposes of this opinion.  The original John Doe petition was filed to challenge the acting circuit judge's remote appearance on behalf of "John Doe" as a present and/or future patient who would appear before the acting circuit judge remotely subsequent to the filing of the petition.  Once patients, as defined by section 394.455(31), Florida Statutes (2015), had involuntary inpatient placement hearings scheduled, individual petitions were filed on behalf of those fourteen patients.  Unless otherwise indicated, the term "petitioners" as used throughout this opinion refers to the fourteen identified patients.

care, services, and treatment.  § 394.453(1)(a), (b).  As part of the process, individuals meeting certain criteria may be taken to a receiving facility for involuntary examination. § 394.463.  If the facility administrator timely files a petition for involuntary inpatient placement, counsel must be appointed for the patient and the court must hold an evidentiary hearing on the petition.  §§ 394.436(g)(4), .467(3), (4), (6).  The hearing, often referred to as a Baker Act hearing, must be held within five working days following the filing of the petition.  § 394.467(6)(a)(1); see In re Involuntary Placement of Linn, 79 So. 3d 783, 785 (Fla. 2d DCA 2011).

At the time the petitions at issue were filed with this court, the petitioners were awaiting their Baker Act hearings.  The petitioners and the State, as respondent in these cases, have provided this court with the recent history giving rise to these petitions.  The judge and magistrate currently assigned to preside over Baker Act hearings in Lee County had recently announced, via e-mail, that they would no longer be commuting to the receiving facilities to hold the statutorily required hearing in person. Instead, the judicial officers would preside remotely from the courthouse via videoconference equipment while the patients, witnesses, and attorneys would continue to be physically present at the receiving facility.  It is this new procedure that the petitioners challenge, asking this court to require the judicial officers to be physically present for the hearings "as required by law."

Initially, we note that while the petitions were filed in the alternative, seeking writs of certiorari or prohibition or any "proper remedy" pursuant to Florida Rule of Appellate Procedure 9.040(c), the proper remedy—if any—would be a writ of

- 6 -

mandamus.[2]  For mandamus to lie, the petitioners must demonstrate a clear legal right to have the judge physically present with the petitioners during the hearing and an indisputable legal duty on the part of the judge to be physically present.  See Austin v. Crosby, 866 So. 2d 742, 744 (Fla. 5th DCA 2004).  "Mandamus may not be used to establish the existence of such a right, but only to enforce a right already clearly and certainly established in the law."  Fla. League of Cities v. Smith, 607 So. 2d 397, 401 (Fla. 1992).  And the duty must be one "imposed expressly by law, not by contract or arising necessarily as an incident to the office."  City of Tarpon Springs v. Planes, 30 So. 3d 693, 695 (Fla. 2d DCA 2010) (quoting Escambia County v. Bell, 717 So. 2d 85, 88 (Fla. 1st DCA 1998)).  A writ of mandamus "is available to compel specific action by a trial judge 'where the act sought to be compelled is ministerial in its nature, and where the court, if it acts at all, can only act in one certain way.' "  Johnson v. Levine, 736 So. 2d 1235, 1238 (Fla. 4th DCA 1999) (quoting State ex rel. N. St. Lucie River Drainage Dist. v. Kanner, 11 So. 2d 889, 890 (Fla. 1943)).  Moreover, "mandamus cannot be used to control or direct the manner in which another court shall act in the lawful exercise of its jurisdiction."  Mathews v. Crews, 132 So. 3d 776, 778 (Fla. 2014).

The petitioners here have not cited, and we have not found, an express legal right to have the judicial officer be physically present with the petitioners when

---

[2]Where no written orders have been rendered—as in the cases here—we lack jurisdiction to consider petitions for writ of certiorari.  Fla. R. App. P. 9.100(b), (c)(1).  Nor can we consider the petitions as seeking writs of prohibition because the judicial officers below have jurisdiction over the Baker Act hearings and are not "acting or threatening to act outside or in excess of [their] jurisdiction."  See Hennig v. Prummell, 40 Fla. L. Weekly D1726, D1726 (Fla. 2d DCA July 24, 2015) (citing English v. McCrary, 348 So. 2d 293, 296 (Fla. 1977)).

holding the Baker Act hearing. Nor have the petitioners cited any express legal duty on the part of the judge. There is simply no duty "clearly and certainly established in the law" requiring the judicial officer to be in the physical presence of the patient, attorneys, and witnesses while presiding over the hearing. See Fla. League of Cities, 607 So. 2d at 401. " '[C]learly established law' can derive from a *variety of legal sources*, including recent controlling case law, rules of court, statutes, and constitutional law." Nader v. Fla. Dep't of Highway Safety & Motor Vehicles, 87 So. 3d 712, 723 (Fla. 2012) (quoting Allstate Ins. Co. v. Kaklamanos, 843 So. 2d 885, 890 (Fla. 2003)). Though this holding arose from a certiorari proceeding, we have found no reason to discount its application in the mandamus context. See, e.g., Pincket v. Detzner, No. SC16-768, 2016 WL 3127704, at *1 (Fla. June 3, 2016) (Pariente, J., concurring in result).

Section 394.467 of the Baker Act governs involuntary inpatient placement and Baker Act hearings. It sets forth the clear and convincing standard by which the judge is to consider the evidence as well as the requirements for the hearing. § 394.467(1). Specifically, section 394.467(6) mandates that the court hold the involuntary inpatient placement hearing within five days of the filing of the petition, that the hearing "be held in the county where the patient is located and shall be as convenient to the patient as may be consistent with orderly procedure," and that the hearing "be conducted in physical settings not likely to be injurious to the patient's condition." § 394.467(6)(a)(1). It requires that "testimony and evidence regarding the patient's competence to consent to treatment" be considered, and it mandates that all testimony be given under oath and that the proceedings be recorded. § 394.467(6)(a)(2), (d).

Nothing in section 394.467 requires the judicial officer to be physically present in the "setting[] not likely to be injurious to the patient's condition."  Further, nothing in the statute requires the judicial officer to consider testimony while physically present in the room with the witnesses.  The statute requires only that the testimony be under oath and the proceedings recorded.  At best, the judicial officer's physical presence at the hearing is part of the manner in which the court holds the hearing, or would ensue from our establishment of the duty to do so.  We cannot grant a writ of mandamus on any of those bases.  See Matthews, 132 So. 3d at 778; Fla. League of Cities, 607 So. 2d at 401; City of Tarpon Springs, 30 So. 3d at 695.

The petitioners' argument appears to be, in part, that in the absence of an express videoconferencing option for Baker Act hearings judicial officers have a ministerial duty to be physically present for them.  In making this argument, the petitioners direct our attention to section 394.467 and other authority.  The petitioners point to section 394.467(2) of the Baker Act, which permits examination of a patient by mental health professionals through "electronic means."  They also call attention to Florida Rule of Judicial Administration 2.530(b), which permits judges to "direct that communication equipment be used for a motion hearing, pretrial conference, or a status conference."  Both of these provisions address remote appearances in various contexts and in varying degrees of specificity, but neither of them creates a ministerial duty compelling the judge to be physically present for a Baker Act hearing.[3]  No

_____

[3]Although proposed by rules committees, Florida's rules of court are adopted and promulgated by the Florida Supreme Court and are binding upon parties, public officers, and judicial officers alike.  Where a rule establishes a nondiscretionary duty and the requirements for issuance of a writ of mandamus are otherwise met, the petition should be granted.  See, e.g., Gabriele v. State, 99 So. 3d 943 (Fla. 2012)

constitutional law, statutes, case law, or rules of court expressly dictate that a judge

must preside over the hearings in these cases by being physically present.  See Nader,

87 So. 3d at 723 (identifying the sources from which clearly established law may be

derived).[4]

        While this court could use its mandamus authority to compel the judge to

preside over the required hearing pursuant to section 394.467, it cannot direct how the

judge should do so in the absence of express direction by law.  That is, "it is clear that

(table decision) (holding that petitioner was entitled to mandamus relief where district court of appeal failed to comply with "indisputable legal duty" under rule 2.540); State ex. rel. Price v. McCord, 380 So. 2d 1037, 1039 (Fla. 1980) (granting writ of mandamus and concluding that rule 9.340 created a ministerial duty under specific circumstances); Gawker Media, LLC v. Bollea, 170 So. 3d 125, 129-30 (Fla. 2d DCA 2015) (detailing a trial court's ministerial duty to comply with the terms of Florida Rule of Civil Procedure 1.440); Lawn v. State, 128 So. 3d 878, 878-79 (Fla. 2d DCA 2013) (stating that rule 2.420 establishes a duty of the clerk of court); Gonzalez v. Rambosk, 86 So. 3d 1125, 1125 (Fla. 2d DCA 2012) (table decision) (granting writ of mandamus based on duty imposed by Florida Rule of Criminal Procedure 3.131); Office of the Att'y Gen. v. Shore, 41 So. 3d 966, 969-70 (Fla. 2d DCA 2010) (granting writ of mandamus, concluding that clerk of court had legal, ministerial duty pursuant to rules 2.535, 9.140, and 9.200); Belgrave-Simmonds v. Belgrave, 122 So. 3d 964, 965 (Fla. 4th DCA 2013) (granting writ of mandamus based on ministerial duty created by rule 2.330); Lynch v. State, 736 So. 2d 1221, 1222 (Fla. 5th DCA 1999) (granting writ of mandamus and concluding that rules 3.180 and 3.220 created ministerial duties).

      [4]Although the dissent takes issue with the majority's approach, we have applied the mandamus standard requiring that a duty must be expressly imposed by the law, and we have looked to the sources of clearly established law identified by the Florida Supreme Court.  We make no assumptions; we simply have found no source of law which clearly and certainly establishes that a judge must be physically present for these hearings.  The dissent articulates no basis to depart from this standard nor points to any source of law expressly requiring a judge's physical presence; access to the courts is not at issue.  There is no question that the judges intend to preside over these hearings; the only question is the manner in which they will do so.  And this court cannot direct that manner.  Moreover, we cannot agree that denying the petitions based upon the mandamus standard long established by the courts of this state expands the application of the writ.  Rather, it appears that the dissent would expand the writ's application by suggesting that these petitions be granted based upon an unexpressed duty.

while the [l]egislature intended a [judge] to preside over" the involuntary inpatient placement hearing, "it left the manner in which the hearing would proceed" to the judge's discretion. See Dep't of Highway Safety & Motor Vehicles v. Fernandez, 114 So. 3d 266, 270 (Fla. 3d DCA 2013) (granting petition for writ of certiorari where appellate division improperly construed statutory mandate that hearing "shall be held before a hearing officer" to mean "in the physical presence of a hearing officer"); cf. City of Miami Beach v. Mr. Samuel's, Inc., 351 So. 2d 719, 722 (Fla. 1977) (holding that mandamus did not lie because pawnbrokerage was not expressly identified in the zoning classifications applicable to property, giving city council discretion not to issue pawnbrokerage license); State ex rel. Nuveen v. Greer, 102 So. 739, 742 (Fla. 1924) (holding that a writ of mandamus would not be granted where there was no duty because "[i]ssuance of the bonds was not expressly forbidden"). That physical presence has previously been traditionally and historically required, technologically required, assumed, or incident to these hearings is of no moment. Cf. Amendment to Fla. Rule of Juvenile Procedure 8.100(a), 796 So. 2d 470, 472 (Fla. 2001) (recognizing that adult first appearances and arraignment proceedings are now routinely held electronically).

In sum, while we question the wisdom of holding these hearings remotely, we conclude that the decision to preside over a Baker Act hearing remotely via videoconference equipment is within the discretion of the court. There is no ministerial, indisputable legal duty clearly established in the law which requires judicial officers presiding over involuntary inpatient placement hearings pursuant to section 394.467 to be physically present with the patients, witnesses, and attorneys. Accordingly, we deny

- 11 -

the petitions.  However, we certify the following question of great public importance to

the Florida Supreme Court:

> DOES A JUDICIAL OFFICER HAVE AN EXISTING
> INDISPUTABLE LEGAL DUTY TO PRESIDE OVER
> SECTION 394.467 HEARINGS IN PERSON?

WALLACE, J., Concurs with opinion.
LUCAS, J., Dissents with opinion.

WALLACE, Judge, Concurring.

I concur fully in Judge Black's well-reasoned majority opinion and in the certification of the question to the Florida Supreme Court. I write separately to explain why I think that the manner in which the trial judge has exercised his authority to conduct involuntary placement hearings is unwarranted. I also explain why I believe that conducting such hearings remotely by videoconference is inappropriate and ill-advised. Finally, I suggest that the appropriate rules committees of The Florida Bar should promptly draft and submit to the Florida Supreme Court proposed rules that will delineate the types of proceedings that a judge may conduct remotely by videoconference and those that the judge may not.

## I.  INTRODUCTION

There is a dearth of authority on the question whether a trial judge may preside remotely at a trial or a final evidentiary hearing by the medium of videoconferencing equipment. But cf. Commonwealth v. Bergstrom, 524 N.E.2d 366, 376-77 (Mass. 1988) (stating in dicta that the substitution of a television monitor for the judge's personal presence at a criminal trial is inadequate). The reason for this dearth of authority is obvious: to date few trial judges have chosen to preside over such important matters remotely by videoconference instead of being physically present. Most of the case law and secondary sources on the use of audiovisual equipment at trials address the issue of the admissibility of testimony by witnesses from remote locations, not the remote appearance of the presiding officer. See, e.g., Harrell v. State, 709 So. 2d 1364 (Fla. 1998); Slawinski v. State, 895 So. 2d 483 (Fla. 4th DCA 2005); Lima v. State, 732 So. 2d 1173 (Fla. 3d DCA 1999); Michael R. Rocha, Going Too Far

in United States v. Yates: The Eleventh Circuit's Application of Maryland v. Craig to Two-Way Videoconferencing, 36 Stetson L. Rev. 365 (2007); Marc Chase McAllister, Two-Way Video Trial Testimony and the Confrontation Clause: Fashioning a Better Craig Test in Light of Crawford, 34 Fla. St. U. L. Rev. 835 (2007).

For a question of the kind that we address here, one naturally turns to the rules of procedure for guidance. Unfortunately, the rules offer little help. The Florida rule regarding the use of communication equipment states, in pertinent part:

> **(a) Definition.** Communication equipment means a conference telephone or other electronic device that permits all those appearing or participating to hear and speak to each other, provided that all conversation of all parties is audible to all persons present.
>
> **(b) Use by All Parties.** A county or circuit court judge may, upon the court's own motion or upon the written request of a party, direct that communication equipment be used for <u>a motion hearing, pretrial conference, or a status conference</u>. A judge must give notice to the parties and consider any objections they may have to the use of communication equipment before directing that communication equipment be used. The decision to use communication equipment over the objection of parties will be in the sound discretion of the trial court, except as noted below.
>
> . . . .
>
> **(f) Override of Family Violence Indicator.** Communications equipment may be used for a hearing on a petition to override a family violence indicator under Florida Family Law Rule of Procedure 12.650.

Fla. R. Jud. Admin. 2.530 (emphasis added). Other sections of the rule address the procedure for the use of communication equipment when requested by fewer than all of the parties and the taking of testimony from a witness by communication equipment. Fla. R. Jud. Admin. 2.530(c), (d). Thus the rule tells us only that communication equipment may be used for a motion hearing, a pretrial conference, a status

- 14 -

conference, or for a hearing on a petition to override a family violence indicator. The rule does not address the issue of whether a trial judge may preside remotely by videoconference equipment at a trial or a final evidentiary hearing except by a rather weak negative inference. The absence of any guidance on this important question is one of the reasons that—as Judge Black points out—it is difficult to find an indisputable legal duty on the part of a trial judge to be physically present at a trial.

## II. TWO PROBLEMS WITH THE PROCEEDINGS IN THE TRIAL COURT

### A. *The Absence of a Proper Court Order*

As an initial matter, I think that the circumstances of the trial court's decision to preside remotely over the involuntary placement hearings in Lee County are problematic. The State supports its argument for the denial of the petition with the complaint that "[p]etitoners have not provided a copy of a court order to support his or her arguments." Well, yes, that is precisely one of the problems with the proceedings in the trial court. There is no court order providing that the trial judge will preside over the involuntary placement hearings remotely through the medium of videoconferencing equipment. Instead, this drastic change to the procedure by which these hearings have previously been conducted in Lee County was initiated by a one-line e-mail dated March 30, 2016, from the trial judge's judicial assistant. This e-mail stated only that the trial court would "be doing Baker Acts beginning this Friday [, April 1, 2016,]" by video. Thus the change from a hearing at which the trial judge would be physically present to a

remote appearance by the judge by means of videoconferencing equipment was made on the basis of an e-mail from the trial judge's judicial assistant.[5]

Changes of this magnitude across a county or a judicial circuit in the way in which a court conducts its business are properly made by administrative order. An administrative order is "[a] directive necessary to administer properly the court's affairs but not inconsistent with the constitution or with court rules and administrative orders entered by the supreme court." Fla. R. Jud. Admin. 2.120(c). Other courts provide for the conduct of some proceedings where the judge presides remotely by videoconferencing equipment. For example, in the Thirteenth Judicial Circuit, a judge presides remotely over various proceedings involving incarcerated defendants. But the use of audiovisual devices to conduct such hearings is specifically authorized by administrative order. First Appearance/Emergency Criminal Division "O", Administrative Order S-2016-029 (Fla. 13th Jud. Cir. July 1, 2016). The assigned judge does not announce by an e-mail that he will be presiding over such hearings remotely.

The adoption of a procedure for a judge to preside remotely over certain proceedings by administrative order is significantly different than having the judge take such action by a private e-mail for at least three reasons. First, unlike an e-mail, an administrative order must be indexed and recorded by the clerk of the court in each county where the order is effective. Fla. R. Jud. Admin. 2.215(e)(3). A set of the recorded copies must be available for inspection as a public record. Id. In fact, the

---

[5]In the cases involving the individual petitioners, the Public Defender has filed a written objection "to the usage of video remote to conduct Baker Act Hearings and Trials and . . . requested[ed] that the presiding officer conduct and attend the hearings in person at the facility." The trial court has entered written orders overruling these objections.

- 16 -

administrative orders of each circuit are generally posted on each judicial circuit's website. Unlike an e-mail, an administrative order is a public document available to all.

Second, administrative orders must be signed by the chief judge of the circuit. Fla. R. Jud. Admin. 2.215(b)(2); State ex rel. Times Publ'g Co. v. Patterson, 451 So. 2d 888, 891 (Fla. 2d DCA 1984). The chief judge is elected by a majority of the active circuit and county court judges within the circuit. Fla. R. Jud. Admin. 2.215(c). The chief judge of the circuit is ultimately responsible to the chief justice of the supreme court. Fla. R. Jud. Admin. 2.215(b)(2). Thus the power to enter administrative orders and the responsibility for them lies exclusively in the chief judge of the circuit.[6] An individual judge who is not the chief judge of the circuit lacks the authority to enter what amounts to an administrative order. Dep't of Juvenile Justice v. Soud, 685 So. 2d 1376, 1378 (Fla. 1st DCA 1997). It is an open question whether the trial judge had the authority to accomplish by a private e-mail what was tantamount to an administrative order governing the conduct of hearings for involuntary placements in Lee County.[7]

Third, an administrative order—unlike an e-mail—is subject to review by writ of certiorari. 1-888-Traffic Sch. v. Chief Circuit Judge, Fourth Judicial Circuit, 734 So. 2d 413, 415 (Fla. 1999); Hatcher v. Davis, 798 So. 2d 765, 765-66 (Fla. 2d DCA 2001); Norris v. State, 737 So. 2d 1240, 1240 (Fla. 5th DCA 1999). The trial judge's decision to change the procedure for conducting involuntary placement hearings in Lee County by e-mail instead of seeking the entry of an appropriate administrative order by

---

[6]It appears from our record that the chief judge of the circuit was aware of the proposed change in procedure.

[7]The parties have not addressed this issue in their filings in this court.

- 17 -

the chief judge of the circuit effectively deprives the petitioners of a means of seeking review that might otherwise have been available to them.

## B.  The Absence of an Explanation

The trial judge must have had a reason for deciding to begin presiding over the involuntary placement hearings remotely.  Unfortunately, we do not know what that reason is.  I have studied the petition, the response, and the reply, together with the multiple appendices filed in these cases.  None of the parties have offered any clue in this blizzard of paper to the reason underlying the judge's decision to start—in the words of his judicial assistant—"doing Baker Acts beginning this Friday" by video.  Thus we are left to guess about what prompted the trial judge to take this step.  Three possible reasons occur to me: cost, efficiency, and security.  But, for the reasons outlined below, none of these explanations provides a satisfactory answer.

With regard to the factor of cost, I note that the involuntary placement hearings are already being conducted at the two receiving facilities, Salus Care and Park Royal Hospital.  Under the new arrangement, the assistant public defender, the assistant state attorney, the court reporter, and any other court personnel will still need to travel to the receiving facilities to participate in the hearings.  The only cost savings will be in the trial judge's expenses for mileage.  Based on the short distances involved, these costs are minimal.  Any savings on the judge's mileage would be substantially exceeded by the cost of acquiring the necessary videoconferencing equipment and its maintenance.  To the extent that the court must employ additional personnel to operate or to maintain the equipment, those costs would be additional.

With regard to efficiency, having the trial judge preside over the involuntary placement hearings from a remote location does not result in a significant increase in judicial efficiency. The distance from the Lee County Justice Center to Salus Care is a little over five miles. The distance to Park Royal Hospital is a little farther at almost eleven miles. The trip to Salus Care could be made in fifteen minutes or less; the drive to Park Royal Hospital would take less than thirty minutes. Thus the time that the judge must devote to travelling to and from these locations is minimal. And to the extent that any driving time for the judge is saved, such efficiencies must be balanced against the time that will inevitably be lost as a result of difficulties encountered in using the equipment and other factors that may not be anticipated. More important, the decision to preside over involuntary placement hearings from a remote location sends a message to the patients and the other participants in the proceedings that the judge does not regard these matters as sufficiently important to warrant a personal appearance. Cf. Ronnie Thaxton, Injustice Telecast: The Illegal Use of Closed Circuit Television Arraignments and Bail Bond Hearings in Federal Court, 79 Iowa L. Rev. 175, 201-02 (1993) (observing that where the judge presides over bond hearings and arraignments from a remote location "[d]efendants and family members may receive the impression that courts consider their cases too trivial for in-person appearances"). The court system should avoid promoting the perception by participants in Baker Act hearings that the judge views the patients' liberty interest as unimportant. Taking all of these matters into account, a quest for efficiency does not adequately explain—much less justify—the trial judge's decision to preside over these hearings from a remote location.

The third possible explanation involves concerns about security. But there is nothing in our record to suggest that security at either of the receiving facilities where the hearings are held has ever been a problem. And we have no hint that a concern for security or personal safety is what has motivated the trial judge's decision to appear remotely at these hearings.

### III. CONDUCTING BAKER ACT HEARINGS BY VIDEO IS ILL-ADVISED

### A. *The Problems with Conducting Trials and Evidentiary Hearings by Video*

The use of videoconferencing equipment to conduct meetings for participants at two or more locations has become common in government and business. This court regularly uses such equipment to conduct conferences between its staff at the headquarters in Lakeland and at the Tampa branch. However, the use of videoconferencing equipment to conduct trials and evidentiary hearings involves multiple difficulties. Such difficulties include, but are not limited to: (1) equipment malfunctions; (2) problems in using the equipment, e.g., the inability to determine who is speaking and participants "talking over" each other; (3) problems with handling documents; (4) the inability of counsel to approach the bench for a private conference; (5) an adverse impact on the relationship between counsel and the court; (6) the loss of normal eye contact and the ability to perceive and assess nonverbal cues, leading to difficulties in assessing credibility and emotion; (7) the perception reported by many that conducting trials and evidentiary hearings by video results in the isolation of the participants and the court, causing dehumanizing effects on everyone involved; and (8) an undermining of the dignity and solemnity traditionally associated with judicial

- 20 -

proceedings.[8]  As I will discuss in the next section of this opinion, many of these difficulties are exacerbated when proceedings for the involuntary placement of persons under the Baker Act are conducted by video.

## B.  Disregarding the Recommendations of the Experts

In considering the matter under review, it is important to bear in mind that this very issue has already been investigated and studied by a distinguished panel of judges, attorneys, and experts in mental health policy and the problems affecting the elderly.  A subcommittee appointed by the Florida Supreme Court in 1997 conducted a comprehensive study of the administration of the Baker Act and its impact on patients, particularly Florida's elderly population.  The subcommittee released its report on December 28, 1999 (the Report).  Subcommittee on Case Administration, Judicial Administration of the Baker Act and Its Effect on Florida's Elders; Report and Recommendations of the Subcommittee on Case Administration (1999); available at http://www.floridasupremecourt.org/pub_info/documents/BakerFinalReport.pdf; see also Mark D. Killian, Fairness Commission Says Baker Act is in Need of an Overhaul, Fla.

---

[8]A detailed review of these difficulties is beyond the scope of this opinion. However, the problems experienced when judicial proceedings are conducted by video have been studied and discussed in numerous articles.  See, e.g., Gerald G. Ashdown & Michael A. Menzel, The Convenience of the Guillotine?: Video Proceedings in Federal Prosecutions, 80 Denv. U. L. Rev. 63, 67-69 (2002); Edie Fortuna Cimino, et al., Charm City Televised & Dehumanized: How CCTV Bail Reviews Violate Due Process, 45 U. Balt. L.F. 56, 70-73 (2014); Anne Bowen Poulin, Criminal Justice and Videoconferencing Technology: The Remote Defendant, 78 Tul. L. Rev. 1089, 1104-41 (2004); Lorne Sossin & Zimra Yetnikoff, I Can See Clearly Now: Videoconference Hearings and the Legal Limit on How Tribunals Allocate Resources, 25 Windsor Y.B. Access to Just. 247 (2007); Ronnie Thaxton, Injustice Telecast: The Illegal Use of Closed Circuit Television Arraignments and Bail Bond Hearings in Federal Court, 79 Iowa L. Rev. 175, 195-202 (1993); Elizabeth C. Wiggins, What We Know and What We Need to Know About the Effects of Courtroom Technology, 12 Wm. & Mary Bill Rts. J. 731, 736-38 (2004).

Bar News, Vol. 27, No. 3 (2000), at 13 (noting the acceptance of the Report by Major B. Harding, then the Chief Justice of the Florida Supreme Court).

In the Report, the subcommittee addressed the conduct of involuntary placement hearings by video. The subcommittee noted that when involuntary placement hearings are held in receiving facilities—as is the case here—patients frequently do not understand that a formal court hearing is taking place. Report at 19. The subcommittee devoted a separate section of the Report to a consideration of the effects of conducting involuntary placement hearings on a population of vulnerable patients by video. Id. at 31-32. The subcommittee recounted the evidence that it received concerning the negative effects of conducting video hearings on patients experiencing mental health issues as follows:

> Martha Lenderman pointed out that some individuals' mental health problems include symptoms of paranoia. These persons may react negatively to video hearings. Some individuals with mental illnesses may be too confused to understand a procedure involving a video hearing. Further, the presiding officer may be limited in observing the situation when confined to viewing only what a camera is focused on. Ms. Lenderman warned that video be used with caution, if at all, for involuntary placement hearings.

> Vince Smith, of the Mental Health Program Office in the Department of Children and Families, was concerned that use of video may increase the number of individuals who decline to participate in their involuntary placement hearings. Winifred Sharp, a Judge on the Fifth District Court of Appeal, observed that it would be very difficult to make a video proceeding look or feel like a formal court hearing, and therefore the chance that a patient might not understand a court proceeding is occurring would continue to present a challenge.

Id. Based on the evidence before it, the subcommittee issued a strong recommendation against the use of video for involuntary placement hearings. Id. at 32.

The Public Defender of the Twentieth Judicial Circuit brought the Report and its recommendations to the attention of the trial court before the new procedure went into effect.  For reasons unexplained in our record, the trial court decided to proceed with the video hearings despite the evidence received by the subcommittee and its well-considered recommendation against conducting Baker Act hearings by video.

## C.  Disregarding the Lessons of Experience

Despite the novelty of the legal issue presented in this case, the Florida courts have substantial experience with the effect of video hearings on a vulnerable population.  Indeed, we've seen this movie before.  In 1999, the Florida Supreme Court adopted on an interim basis an amendment to Florida Rule of Juvenile Procedure 8.100(a) that authorized juveniles to attend juvenile hearings through the use of audio visual equipment.  Amendment to Fla. Rule of Juvenile Procedure 8.100(a), 753 So. 2d 541 (Fla. 1999).  The court's adoption of the amendment to the rule followed a one-year pilot program that authorized chief judges in the fifth, ninth, thirteenth, seventeenth, and nineteenth judicial circuits to allow juveniles to attend detention hearings by audiovisual device.  Amendment to Fla. Rule of Juvenile Procedure 8.100(a), 667 So. 2d 195 (Fla. 1996).

The results of the implementation of the amended rule were mixed.  Proponents pointed to advantages such as improved safety, elimination of the need to transport juveniles from detention facilities to the courthouse, the resulting allowance of more time for juvenile inmates to pursue counseling and their studies, and the avoidance of the degrading spectacle of parading handcuffed and shackled juveniles

- 23 -

through the courthouse.  Amendment to Fla. Rule of Juvenile Procedure 8.100(a), 796

So. 2d 470, 472 (Fla. 2001).  Critics of the amendment—particularly the Florida Public

Defenders' Association—pointed to a variety of problems with the new procedure.  Id. at

473.  After weighing the advantages and disadvantages of the program, a divided court

decided to repeal the amendment and to eliminate the use of videoconferences for

juvenile detention hearings.  Id. at 471; see generally Gerald G. Ashdown & Michael A.

Menzel, The Convenience of the Guillotine: Video Proceedings in Federal Prosecutions,

80 Denv. U. L. Rev. 63, 79-84 (2002) (discussing Florida's experiment with

videoconferencing for juvenile detention hearings).

   The court discussed the difficulties that had been experienced with the

use of videoconferencing for juvenile detention hearings as follows:

> Independent observations confirmed the fears expressed by
> all who have strongly and continuously opposed the
> adoption of the proposed robotic procedure.  Specifically,
> many observed that there was no proper opportunity for
> meaningful, private communications between the child and
> the parents or guardians, between the parents or guardians
> and the public defender at the detention center, and between
> a public defender at the detention center and a public
> defender in the courtroom.  The mechanical process
> produced a proceeding where, on many occasions, multiple
> parties would speak at once, adding to the confusion.  At the
> conclusion of far too many hearings, the child had no
> comprehension as to what had occurred and was forced to
> ask the public defender whether he or she was being
> released or detained.  It was also problematic that the public
> defender at the detention center often had no access to the
> child's court file, and there was absolutely no opportunity to
> approach the bench to discuss private matters or anything
> that should not have been openly broadcast.  Moreover,
> perhaps because it was difficult for the children to see, hear,
> and understand what was taking place, the youth did not
> behave as those participating in person in a courtroom; that
> is, the hearings totally lacked the dignity, decorum, and

> respect one would anticipate in a personal appearance before the court.

<u>Amendment</u>, 796 So. 2d at 473. The court also quoted extensively from comments received from two circuit judges who were highly critical of the experience with videoconferencing. <u>Id.</u> at 473-74. The court concluded that "[t]he repealed rule forced the implementation of a predetermined policy representing a mechanistic and robotic approach to matters that require individualized care and attention." <u>Id.</u> at 474.

Florida's failed experiment with using videoconferencing to conduct juvenile detention hearings has obvious implications for the use of such equipment in involuntary placement hearings. The court's indictment of the use of videoconferencing for Florida's vulnerable juvenile population is equally applicable to hearings involving persons dealing with mental health issues. The technical problems experienced with the use of the video equipment for juvenile detention hearings will be repeated in Baker Act hearings. Both juveniles and persons with mental health issues may experience problems in expressing themselves in unfamiliar situations and may not fully understand the significance of legal proceedings. For both of these groups, innovations like the use of video equipment that will make their participation in hearings that affect their liberty interest more difficult ought to be avoided. The trial court's decision to preside over the involuntary placement hearings from a remote location by video disregards the lessons that we should take from the history of Florida's failed experiment with the use of video equipment for juvenile detention hearings.

## IV. THE NEED FOR APPROPRIATE AMENDMENTS TO THE RULES

The problems posed by these cases illustrate that our technological capabilities in the area of videoconferencing have outpaced the adoption of court rules

necessary to regulate judicial proceedings conducted by video where the judge presides from a remote location. As we go forward, the issue of videoconferencing in judicial proceedings is not likely to be confined to juvenile detention hearings or proceedings for involuntary placements. I anticipate that the next step could involve a situation where a judge residing in or based in one county within a judicial circuit decides to conduct a proceeding remotely by video in another county within the circuit. For example, a judge might decide to conduct a felony trial in Moore Haven remotely from her chambers in Fort Myers. Similarly, another judge might choose to preside over a medical malpractice trial in Wauchula remotely from his chambers in Bartow. I think that most lawyers and judges would conclude that for a judge to preside over such matters remotely by video would be both unfair to the participants and highly inappropriate. But as this case shows, it is not clear under our current law and rules that a judge could not do either of these things. For this reason, I suggest that the Rules of Judicial Administration Committee or other appropriate court rules committees of The Florida Bar should prepare and submit to the Florida Supreme Court proposed rules that address the question of what types of proceedings judges may preside over remotely by video and what proceedings they may not. Appropriate amendments to our court rules to bring them up to date with our technological capabilities are long overdue.

LUCAS, Judge, dissenting.

I fully agree with the majority's characterization of the petitions before us as reviewable only by mandamus. I also share Judge Wallace's well-informed concerns about the use of videoconferencing technology within Baker Act court proceedings.

Nevertheless, I cannot join the court's holding today because of two concerns I hold. The crux of the issue before us revolves around how one defines a ministerial, judicial duty for purposes of mandamus relief. My colleagues have applied a narrow definition of that duty in these cases (essentially holding that because no statute, court opinion, or procedural or administrative rule expressly requires judicial officers to appear in person over Baker Act hearings, no such requirement exists). At the same time, they appear to have adopted an expansive view of this extraordinary writ for future cases: "Where a rule [of procedure] establishes a nondiscretionary duty and the requirements for issuance of a writ of mandamus are otherwise met, the petition should be granted." See supra note 3. The latter point finds a level of support in certain general pronouncements we find in Florida law. But to my mind, some of the potential implications of enforcing procedural rules through mandamus have never been fully considered or, in truth, even acknowledged. The former point can be correct only with the tacit assumption that a judicial officer's duty to preside over a trial or evidentiary hearing finds its entire being within published court opinions or procedural rules. My colleagues may be entirely correct in both regards, but I would address some of these ramifications before we carry (or cabin) the writ of mandamus to the boundaries they have demarked. Therefore, I respectfully dissent. I would answer the certified question in the affirmative for the reasons I will explain below.

I.

"A judge shall hear and decide matters assigned to the judge . . . ." Fla. Code of Jud. Conduct, Canon 3. From time immemorial, judges and magistrates have heard and decided matters by coming to a central place, a court, where the people could present their cases.[9] Today, in Florida, the judicial duty to preside over trials and evidentiary hearings[10] follows this tradition and is grounded upon the constitutional right of access to our state's courts guaranteed under the Florida Constitution. See art. I, § 21, Fla. Const. ("The courts shall be open to every person for redress of any injury, and justice shall be administered without sale, denial or delay."); Bell v. Bell, 307 So. 2d 911, 914 (Fla. 3d DCA 1975) (noting the "constitutional duty imposed on the judiciary" who is "duty bound to examine and consider the evidence for itself and to make a judicial determination"); see also De Clements v. De Clements, 662 So. 2d 1276, 1283 (Fla. 3d

---

[9]Cf. Judges 4:4-5 ("And Deborah, . . . she judged Israel at that time. And she dwelt under the palm tree of Deborah between Ramah and Bethel in mount Ephraim: and the children of Israel came up to her for judgment."). Historically, without a judicial officer's personal presence, a court was not considered to be in session. See Delafield v. Lewis Mercer Constr. Co., 20 S.E. 167, 167 (N.C. 1894) ("There was once, to some extent, an idea prevalent that the term of a court extended to the last Saturday of the one, two, or three weeks for which it might be held, although the judge might have left. This idea of a court in session without a judge is not warranted by law."); Boyd v. Teague, 16 S.E. 338, 338 (N.C. 1892) ("The term of court is held by the judge, and there can be none after he leaves.").

[10]The issue before us concerns judicial officers presiding over an evidentiary hearing that, by statute, is convened under the jurisdiction and authority of a circuit court and requires a determination from the evidence to be made by the presiding judicial officer. Judge Black's opinion's citation to Department of Highway Safety & Motor Vehicles, Bureau of Administrative Reviews v. Fernandez, 114 So. 3d 266 (Fla. 3d DCA 2013), has no bearing on this issue. That case addressed the propriety of a hearing officer's telephonic appearance for a driver's license revocation proceeding administered through the Department of Highway Safety and Motor Vehicles. See art. V, § 1, Fla. Const. ("The legislature may establish by general law a civil traffic hearing officer system for the purpose of hearing civil traffic infractions.").

DCA 1995) (observing that "the trial judge is the only elected constitutional officer with the organic right to determine a litigant's case"). Unless waived, a judge's personal presence is *constitutionally mandated* in a criminal jury trial. See Bryant v. State, 656 So. 2d 426, 428 (Fla. 1995) ("The presence of a judge, who will insure the proper conduct of a trial, is essential to the state and federally guaranteed rights of trial by an impartial jury."); Brown v. State, 538 So. 2d 833, 835 (Fla. 1989) (same).

In gleaning the extent of the judicial duty at issue here, we can, and should, look to the constitutional right of access to courts, precedent that expressly tethers a judge's physical presence to a constitutional right, and the entirety of tradition and history. These bedrock principles, drawn together, fill the dearth of authority that my colleague, Judge Wallace, apprehends. But if there is any silence in the law on this issue, it must surely be ascribed to the fact that a judge or magistrate's personal attendance at trial has been the assumed norm for as long as there have been courts and judges. In my view, a judge's physical presence is simply a constituent component of his or her ministerial duty to preside over a trial or evidentiary hearing.

Proceedings arising under the Baker Act should be no exception to this duty. A hearing convened under section 394.467 is an evidentiary court proceeding, akin to a trial, where the rules of evidence must be followed, where arguments of counsel must be heard, and where a patient's liberty interests will ultimately be at stake. See In re Beverly, 342 So. 2d 481, 489 (Fla. 1977) ("The seriousness of the deprivation of liberty and the consequences which follow in adjudication of mental illness make imperative strict adherence to the rules of evidence generally applicable to other proceedings in which an individual's liberty is in jeopardy."); In re Holland, 356 So. 2d

- 29 -

1311, 1313 (Fla. 3d DCA 1978) ("We fully recognize that involuntary hospitalization is a massive deprivation of liberty which the state cannot accomplish without due process of law."); see also Chalk v. State, 443 So. 2d 421, 422 (Fla. 2d DCA 1984) (holding that patient's constitutional due process rights were violated when presiding judge prevented his attorney from presenting a closing argument at the conclusion of his involuntary placement hearing).

Were it not for the relatively recent expansion of videoconferencing technology, there would have been no question that the judicial officers who are the subject of these petitions violated a ministerial duty by not coming to the designated place where their docket would convene to preside over these evidentiary hearings. Cf. Beverly, 342 So. 2d at 489; Bell, 307 So. 2d at 914. In holding that no such duty exists, then, my colleagues have embraced an implicit assumption. They assume that the mere advent of a new technology somehow, of its own accord, upended what had been a rooted, commonly understood judicial duty and a hallmark of evidentiary court proceedings, where a judge or magistrate comes to court to preside. The majority has effectively—albeit with apt reluctance and remonstrations—excused the physical presence of judicial officers from Baker Act hearings because: (i) the Baker Act itself does not include a direction that they be physically present, (ii) their remote appearance has become feasible, and (iii) a rules committee may not have fully addressed that technological development.[11] Mandamus requires a close review of the law to

---

[11]Cf. The Fla. Bar re: Rules of Judicial Admin., 462 So. 2d 444, 445 (Fla. 1985) (observing, in adopting the rules of judicial administration, "that all parties have an absolute right to prohibit the taking of testimony of a witness by communication equipment"); Fla. R. Jud. Admin. 2.530(b) (authorizing use of communication equipment "for a motion hearing, pretrial conference, or a status conference"). I fully share Judge

determine whether a legal duty has been established, to be sure. But I cannot believe that its application in these cases must turn, *argumentum ex silentio*, on the mere fact that a court or committee has yet to utter what had always, inarguably, been a quintessential, necessary feature of any trial or evidentiary hearing: a judicial officer's physical presence. If there is any assumption to be made about the scope of a judicial officer's duty to preside over Baker Act hearings, the majority has inverted it. While the court is right to certify a question of great public importance here, I would answer that question in the affirmative. In my opinion, a judicial officer bears an indisputable, legal duty to preside over a Baker Act hearing, in person, unless the litigants have waived his or her presence.

II.

I now turn to the other, related question these cases raise: from what sources can a court derive a "legal, ministerial duty" for judicial officers for purposes of mandamus relief? I have grounded my view of the judicial duty at issue in these cases, purposely, on the constitution, case authorities interpreting the scope of the constitutional right of access to courts, and the historic view of how our constitutionally created trial courts have traditionally operated. I have purposely avoided drawing rules

---

Wallace's concerns about the qualitative shortcomings of videoconference court proceedings; indeed, my view of the judicial duty to preside over these proceedings in person protects litigants from the very serious problems he so thoroughly recounts. That this duty derives from the establishment of our courts and the lawful duty imposed on judges to hear and decide cases also, in my opinion, provides a more felicitous grounding for mandamus review in general. However, if I am mistaken about the extent of a judge's duty to preside in person, if there is any uncertainty about the ministerial duty here, then we ought to look to the constitution, state statutes, or a court opinion interpreting the organic sources of ministerial duties—rather than issue a call-and-response to an unelected committee of lawyers and judges—for guidance.

of procedure within that analysis. My colleagues would cast the net of mandamus wider to include any Florida rule of court, so long as the rule is sufficiently nondiscretionary "and the requirements for issuance of a writ of mandamus are otherwise met"—and they are not without precedent to support that proposition.[12]

Yet, I question whether a rule of procedure, on its own authority, can be likened to "a ministerial duty *imposed by law* on a public official." See Sancho v. Joanos, 715 So. 2d 382, 385 (Fla. 1st DCA 1998) (emphasis added) (citing City of Coral Gables v. State ex rel. Worley, 44 So. 2d 298, 300-01 (Fla. 1950)). As I interpret the outer boundaries of what violations of which legal duties will justify mandamus relief (admittedly, an unsettled area of the law), I believe the writ of mandamus ought to be limited to those ministerial, legal duties that the People have imposed upon their public officials, either through legislation or constitutional provision. Cf. Solomon v. Sanitarians' Registration Bd., 155 So. 2d 353, 356 (Fla. 1963) (explaining that "official action is considered ministerial when it is arrived at as the result of the performance of a

---

[12]Although I suspect in many of the rulings in which we see a writ of mandamus issued to enforce a rule of procedure, one would only need to scratch the surface of the cited rule to discern a more substantive, legal duty that was being compelled. For example, our holding in Office of the Attorney General v. Shore, 41 So. 3d 966 (Fla. 2d DCA 2010), focused on whether the clerk of the circuit court had complied with applicable appellate and judicial administration rules by forwarding copies of criminal case records to a public defender in CD-ROM format, but the underlying source of the clerk's ministerial duty to compile and provide access to a record is founded in state statutes. See § 28.13, Fla. Stat. (2010); Radford v. Brock, 914 So. 2d 1066, 1068 (Fla. 2d DCA 2005) ("The Clerk of the Circuit Court has a legal duty to maintain and to provide access to the records contained in its files unless the records are legally exempt from disclosure." (citing §§ 28.13; 119.01(1), (3); 119.011(1), (2), Fla. Stat. (2003))). Even in Gawker Media, LLC v. Bollea, 170 So. 3d 125 (Fla. 2d DCA 2015), we appeared to premise our issuance of mandamus as much on the force of well-established precedent as on the mandatory language of rule 1.440. Id. at 130 ("Indeed, a trial court's obligation to hew strictly to the rule's terms is so well established that it may be enforced by a writ of mandamus . . . .")

specific duty arising from legislatively designated facts.  A ministerial duty is one which is positively imposed by law to be performed at a time and in a manner or upon conditions which are specifically designated by the law itself . . . ."); Warren M. Goodrich & Al J. Cone, Mandamus in Florida, 4 U. Fla. L. Rev. 535, 535 (1951) (recognizing that "[a] characteristic of a democratic society is the protection afforded citizens against the abuse of public office" and noting that the writ of mandamus is "a protector of democratic rights").  Rules of procedure, *qua* rules, do nothing more than implement substantive law.  See State v. Garcia, 229 So. 2d 236, 238 (Fla. 1969) ("Procedural law is sometimes referred to as 'adjective law' . . . and has been described as the legal machinery by which substantive law is made effective."); Williams v. State, 932 So. 2d 1233, 1237 (Fla. 1st DCA 2006) ("Substantive law creates substantive rights; rules of procedure . . . 'merely provide the remedies to enforce rights.' " (quoting State v. Dorian, 619 So. 2d 311, 313 (Fla. 3d DCA 1993))).  To elevate a rule of procedure or judicial administration—drafted by a committee and adopted under authority relegated to the judiciary—to an equal status as a duty imposed by law would seem to pose something of a conceptual anomaly within our separation of powers.  Cf. State v. Raymond, 906 So. 2d 1045, 1048-49 (Fla. 2005) (distinguishing rules of practice and procedure as the "method[s] of conducting litigation involving rights and corresponding defenses" from substantive law as "the law which creates, defines, and regulates rights, or . . . which courts are established to administer"); Pole v. State, 41 Fla. L. Weekly D1843a, D1846a (Fla. 2d DCA Aug. 10, 2016) (Casanueva, J., concurring) ("To afford the judicial branch with the power—through the passage of rules of procedure—to grant [the right to

counsel] appears to me to be contrary to the separation of powers delineated by the constitution.").

Moreover, extending the writ of mandamus to encompass procedural rules strikes me as a somewhat unobvious and unexamined outgrowth from a writ whose origin and purpose is already shrouded by an unobvious and largely unexamined development. See, e.g., Alto Adams & George John Miller, Origins and Current Florida Status of the Extraordinary Writs, 4 Fla. L. Rev. 421, 437-38 (1951) ("From these humble beginnings as a writ of restitution to office [the writ of mandamus] gradually expanded . . . not only for ordering admission to 'packed' municipal corporations but also for enforcing exercise of jurisdiction by inferior tribunals . . . and finally for compelling performance of ministerial duties generally" but noting that a thorough study of the origins of the writ of mandamus "remains to be made"); Paul R. Gugliuzza, The New Federal Circuit Mandamus, 45 Ind. L. Rev. 343, 352-53 (2012) ("The origins of the writ of mandamus are 'very obscure,' . . . . Early American courts and the first U.S. Congress imported the view that mandamus was an extraordinary remedy designed to fix only jurisdictional errors."); Edward Jenks, The Prerogative Writs in English Law, 32 Yale L. J. 523, 529-30 (1923) (attributing the original formulary of the writ of mandamus to Sir Edward Coke's decision in Bagg's Case, 77 Eng.Rep. 1271 (K.B. 1616) and observing that "[m]andamus is perhaps the most puzzling of all the prerogative writs"). In the absence of a settled principle as to *why* a writ of mandamus ought to issue (we have ample jurisprudence that tells us when), the majority leaves us with a formulation that all but invites an ever expanding reach of the writ's jurisdiction, and in ways that could become difficult to reconcile or constrain with any meaningful coherence.  Should

the violation of any rule with nondiscretionary aspects warrant mandamus relief? Under what circumstances? The only limitations my colleagues offer—that the procedural rule must be nondiscretionary and the "requirements . . . for a writ of mandamus" must be met—are perhaps the best that can be articulated, and they amount to a tautology.

While the court is correct to characterize these petitions as seeking mandamus relief and rightly admonishes the actions of these judicial officers, it has missed a more proper resolution of these petitions, in part, because it may be searching in the wrong body of law for guidance. Rules of procedure and administration ought not to serve as mandamus grist for courts to expand and wield the coercive power of an extraordinary writ. Instead, we should look to the substantive law, statutory and constitutional, that the People have imposed upon their judicial officers. Within that body of law, I would find sufficient support to grant mandamus relief to these petitioners.